**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1290**

---

UNITED STATES OF AMERICA EX REL. HAILE KIROS NICHOLSON,

        Plaintiff - Appellant,

v.

MEDCOM CAROLINAS, INC.; JEFF TURPIN,

        Defendants - Appellees,

 and

JOHN DOES 1-50,

        Defendants.

---

Appeal from the United States District Court for the Middle District of North Carolina at Greensboro.  William L. Osteen, Jr., U.S. District Judge.  (1:17-cv-00034-WO-LPA)

---

Argued:  March 10, 2022                                  Decided:  July 21, 2022

---

Before WYNN, HARRIS, and RICHARDSON, Circuit Judges.

---

Affirmed as modified by published opinion.  Judge Richardson wrote the opinion, in which Judge Wynn and Judge Harris joined.

---

**ARGUED:**  Volney LaRon Brand, BRAND LAW, PLLC, Dallas, Texas, for Appellant. Jeffrey Ryan Whitley, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellees.

**ON BRIEF:** Stephen W. Petersen, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellees.

RICHARDSON, Circuit Judge:

While working for a company that makes skin grafts, Haile Kiros Nicholson caught wind of a kickback scheme operating in a Veterans Administration hospital. In broad strokes, the scheme involved the sale of skin grafts to the VA by commission-based salespeople who were paid based on how much they sold. If true, that would likely violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, which would then make each commission-induced sale a violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. So Nicholson brought this qui tam suit as a False Claims Act relator on behalf of the United States government and an analogous state-law claim under North Carolina law.

After the United States declined to intervene in the suit, Nicholson prosecuted it. Because he used conclusory language in his original Complaint, the district court dismissed the Complaint with prejudice for failure to state a fraud claim with particularity under Federal Rule of Civil Procedure 9(b). When Nicholson moved to amend his Complaint after judgment, the district court denied leave to amend, in part based on a finding of bad faith.

We agree with the district court's dismissal of the original Complaint for a lack of particularity. Given that it is largely made up of conclusory allegations, the original Complaint may even have failed Rule 8's lower standard of plausibility. We also find that the district court did not abuse its discretion in denying leave to amend for bad faith. So we affirm the district court's dismissal (with one minor modification, clarifying that a state-law claim was dismissed without prejudice).

3

## I.      Background

From what we can tell, the basic shape of Nicholson's alleged kickback scheme is simple enough.  Integra made skin grafts, and they used another company, MedCom Carolinas, Inc. ("MedCom Inc."), to sell those skins grafts.  MedCom Inc. is run by its owner, Jeff Turpin.  According to Nicholson, Turpin, and MedCom Inc. used independent contractors to promote the Integra skin grafts and paid them by commission based on their sales numbers.  And paying commissions for referring the skin grafts to the VA would violate the federal Anti-Kickback statute.

From there, the details get hazy fast.  While litigating this case in the district court, Nicholson offered two Complaints—his original Complaint and an Amended Complaint. Because we need not reach the Amended Complaint, we focus on the original Complaint, but include the allegations in the Amended Complaint to add some clarity to a confusing set of allegations.

### A.      The Original Complaint

Nicholson filed his original Complaint under seal in 2017.  It included five counts: Counts I, II, and III were claims under three provisions of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B) & (C); Count IV was a private cause of action under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b; and Count V was under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-607.

In paragraph 16 of the Complaint, Nicholson describes the illegal scheme that formed the basis of all his claims.  Because much of the difficulty here comes from trying

4

to make heads or tails of what is being alleged in that paragraph, we include it here verbatim:

> Relator's employer Integra utilized 1099 nonemployee reps to generate referrals for Medicare/Medicaid and other federal healthcare program patients in violation of the anti-kickback statute. Specifically, these representatives were paid by Jeff Turpin who owns MedCom LLC in whole or in part for furnishing items covered by federal healthcare programs and received commissions based on the same including PriMatrix and Integra Dermal Replacement Therapy. Relator learned of this scheme based upon his employment with Integra whereby these representatives engaged in national competitions with the full-time employees. Relator spoke with treating physicians, reimbursement personnel, and also received compensation for these 1099 nonemployee's role in generating these sales. For example, on or about Nov 2016, Patient T. W. received an Integra Dermal Replacement Therapy graft furnished by Relator's 1099 counterpart/sales representative Holloway whereby VA care benefits paid for this graft utilized by Dr. Phillips in excess of $3,000.00.

J.A. 15.

Some of the story comes through clearly enough: Nonemployee representatives— in other words, independent contractors[1]—were paid, at least in part by commission, to furnish skin-graft products to federal healthcare programs like VA hospitals. That is the basic kickback scheme. Representatives were paid commission to sell Integra skin grafts to VA doctors. Nicholson learned about this scheme through his work at Integra and by speaking to doctors and "reimbursement personnel." Nicholson offers a sketch of one such sale, from a salesperson called Holloway to a Dr. Phillips at a VA hospital, around November 2016, for at least $3,000.

---

[1] By "1099 nonemployee reps," the Complaint is likely referring to the IRS form 1099-NEC, which is used to report income as an independent contractor. That form can be contrasted with the W2, which is the form used to report income as an employee. So we understand the reference to 1099 reps and the like to be lingo referring to workers who were independent contractors and not employees.

5

Though the outline is clear, there is considerable ambiguity and confusion about the specifics. How Nicholson knows all this is obscure. "National competitions" are mentioned—and competition does at least suggest promotion, incentives, and inducements—but those competitions are not described in any detail at all. Nicholson says he "received compensation for these 1099 nonemployee's role in generating sales," but it is not clear whether that means Nicholson himself made some of these sales and got commissions or whether he was the person at Integra receiving the sales proceeds from the government, perhaps working in the billing department. As to the example involving Holloway, many important details are missing: No first names were used; no location was given (which VA hospital, where in the country?); the payment amount is vague, somewhere on the border between guess and estimate; and he does not link that sale to the general kickback scheme, except by a dangling introductory phrase "For example."

The district court focused largely on two further reasons for confusion. First, there is a confusion about how many MedComs there are. You may have missed it at first pass, but there is a discrepancy between the MedCom in the case caption and the MedCom described in paragraph 16 of the Original Complaint. The caption names "MedCom Carolinas, Inc." (that is who we have been calling "MedCom Inc.") as a defendant, but paragraph 16 describes actions performed by MedCom LLC. In its opinion dismissing the Original Complaint, the district court refused to assume that MedCom LLC and MedCom Inc. were one and the same. The court pointed out that, even after having this confusion raised in Defendants' briefing, Nicholson continued to refer to nonparty MedCom LLC in later briefing. And the Complaint talks about "Defendant *companies'* payments," which

might suggest MedCom Inc. and MedCom LLC; or MedCom Inc. and Integra; or MedCom Inc., MedCom LLC, *and* Integra.[2]

The second cloud of confusion covered who the 1099 representatives worked for: MedCom Inc., MedCom LLC, or Integra. Paragraph 16's first sentence says, "Integra utilized 1099 nonemployee reps," suggesting Integra paid them. But the next sentence says, "*these representatives* were paid by Jeff Turpin who owns MedCom LLC." That phrase links back to the first sentence, suggesting that maybe Integra did not pay for them after all and one of the MedComs did. Maybe it was some combination of the three. Nicholson then says that the reps were paid by Jeff Turpin but also that they "received commissions." Who paid those commissions is unclear. Integra, either of the MedComs, or Turpin himself could have done so. And it is precisely this commission—not ordinary pay—that forms the basis for these claims.

To put it mildly, paragraph 16 lacks clarity. After paragraph 16, the Complaint claims that this scheme led to thousands of false claims, that they necessarily caused violations of the Anti-Kickback Statute, and that those violations were routine.

After reviewing the Complaint, the United States declined to intervene, and the Complaint was unsealed and served on MedCom Inc. and Turpin. MedCom Inc. and

---

[2] In truth, it is hard to make much of the phrase "defendant companies'," J.A. 15, because there is only one company named as a defendant. So no matter what additional companies are included in that phrase, they are not truly *defendant* companies.

7

Turpin moved to dismiss the Complaint, and that motion was granted two years later. The district court dismissed the Complaint with prejudice and entered judgment.[3]

### B.    The Amended Complaint

Nicholson then moved to amend or alter the judgment under Rule 59(e) and for permission to file an amendment under Rule 15(a)(2), attaching a proposed Amended Complaint to the motion.

The Amended Complaint adds more detail about the scheme, but the same basic shape appears. First and most importantly, MedCom LLC disappears, leaving only MedCom Inc. Next, the changes clarify who the representatives work for. Instead of only Integra "utilizing" the independent contractors, "Integra and MedCom both utilized" them. J.A. 146. But "to be clear, the 1099 employees were employees of MedCom not Integra." J.A. 146 n.1. (The distinction between "utilizing" the reps and claiming them as employees is not explained.) Nicholson also added more detail about how he learned all this. He described further knowledge based on "easy access" to purchasing information, access to things like pricing schedules, patient information, and doctor information. J.A. 149. He claimed that he learned more about the commission scheme from speaking to Jeff Turpin and his representatives. In those conversations, Turpin's representatives apparently told Nicholson that Turpin was MedCom Inc.'s sole owner and did all the hiring and firing.

---

[3] There is a slight ambiguity about the resolution of the state-law claim in the district court's order granting the motion to dismiss. On one page, the district court "decline[d] to exercise supplemental jurisdiction" over the state-law claim, but then on the next page, the court dismissed the whole case with prejudice, suggesting that even the state-law claim was dismissed with prejudice. J.A. 118–19.

Turpin also told Nicholson that he paid the representatives "on a strictly commission basis" based on "the volume of reimbursements for these products they sold." J.A. 147–48.

Nicholson also adds more information about Holloway—now Robert Holloway— and from Holloway, more information about the scheme. Holloway worked in Durham, NC and had inside knowledge of the scheme. According to what Holloway allegedly told Nicholson, the way the scheme worked was that MedCom Inc. sales reps would sell skin grafts to government programs (like VA hospitals) and submit claims for payment to the hospitals who would then pay out to Integra. From there, Integra would send 25% of the net sales money back to MedCom Inc. as a commission, and MedCom Inc. would pay 40% of its share to the representative (like Holloway).

Nicholson also fleshed out the story surrounding Holloway's November 2016 payment. The sale was to the VA hospital in Durham, NC; that hospital took claims from salespeople at the time of the procedure at a preset price; and Holloway sold a graft to Dr. Phillips for use on Patient T.W. and submitted the claim for a payment of at least $3,000 to the hospital, which was paid to Integra. There is no mention in the Amended Complaint of whether the 75/25, 60/40 split was followed in the November 2016 sale.

Much of the rest of the Amended Complaint remained the same: Nicholson included the same five Counts and asked for the same relief.

In March 2021, the district court denied both the motion to amend and the motion to alter the judgment, citing as its reasons, first, bad faith, and second, that the Amended Complaint would have been futile for similarly failing to state a claim with particularity. Nicholson timely appealed, and we have jurisdiction. 28 U.S.C. § 1291.

9

## II.     Discussion

On appeal, Nicholson challenges the dismissal of his Original Complaint, the district court's decision to dismiss the Complaint with prejudice, the denial of leave to amend for bad faith, and the denial of leave to amend for futility.  Because we find that the district court was right to dismiss the Original Complaint, that the court did not abuse its discretion in dismissing the Complaint with prejudice, and that the court did not abuse its discretion in denying leave to amend for bad faith, we need not discuss the sufficiency of the allegations in the Amended Complaint.[4]

### A.     Dismissal of the Original Complaint

#### 1.     Failure to State a Claim with Particularity

We review a district court's dismissal of a complaint for failure to state a claim de novo.  *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 195 (4th Cir. 2018).  Nicholson brings three claims under the False Claims Act:  a "presentment claim" under

---

[4] Nicholson's appeal focuses on the three False Claims Act claims and does not discuss Count IV, the standalone Anti-Kickback Statute violation.  While the Fourth Circuit has not yet addressed the issue, other courts agree that there is no private cause of action under the Anti-Kickback Statute.  *See United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 37 (D.D.C. 2003) (citing *W. Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 255 (7th Cir. 1988)); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 78 (D. Conn. 2007); *Donovan v. Rothman*, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000).  But either way, Nicholson waived this argument by conceding it before the district court.

31 U.S.C. § 3729(a)(1)(A),[5] a false-record-or-false-statement claim under § 3729(a)(1)(B),[6] and a conspiracy claim under § 3729(a)(1)(C).[7]

Roughly speaking, a presentment claim alleges that a defendant knowingly submitted a false claim to the government themselves. A false-record-or-statement claim alleges that a defendant knowingly made a false statement or produced a false record material to a false claim that was submitted to the government by someone else. And a conspiracy claim covers knowing agreements to do either. Both a presentment claim and a false-record-or-statement claim under the False Claims Act require four elements: (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999). For the conspiracy claim, the plaintiff must show that the defendants "agreed that [a] false record or statement would have a material effect on the Government's decision to pay [a] false or fraudulent claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008). Nicholson brings all three claims against Turpin and MedCom Inc.

---

[5] "[A]ny person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable . . . ." § 3729(a)(1)(A).

[6] "[A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable . . . ." § 3729(a)(1)(B).

[7] "[A]ny person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . is liable . . . ." § 3729(a)(1)(C).

11

Nicholson's theory about what makes the alleged claims here false or fraudulent is that they violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.  A violation of that statute "automatically constitutes a false claim under the False Claims Act." *United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021) (citing *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017)); *accord* 42 U.S.C. § 1320a-7b(g) ("[A] violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.").  Under the Anti-Kickback Statute, it is illegal for any person to knowingly solicit or receive "remuneration" in return for referring any "good, facility, service, or item" to someone that will be paid for, at least in part, by a Federal health care program.  42 U.S.C. § 1320a-7b(b)(1)(B).

The Anti-Kickback Statute seems broad enough to criminalize sales by all medical-device salespeople—*e.g.*, those who get paid to sell anything at all to hospitals who take Medicare—but it does not quite go that far.  The statute includes an exception for "any amount paid by an employer to an employee [within] a bona fide employment relationship."  § 1320a-7b(b)(3)(B).  Also, given the statute's ominous breadth, the Department of Health & Human Services was given the ability to modify exceptions to the rule and to create further exceptions to the rule.  Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, sec. 14, 101 Stat. 680, 697.  The Code of Federal Regulations includes a long list of agency-created exceptions to this rule, and one of those is for personal services and management contracts and outcomes-based payment arrangements.  42 C.F.R. § 1001.952(d).  That is how the regulations describe the bona-fide-employee safe harbor.  But that exemption only applies to sales employees that

meet certain criteria, one of which is that the payment of the employee's salary "*is not determined in a manner that takes into account the volume or value of any referrals.*" § 1001.952(d)(1)(iv) (emphasis added). In other words, commissions earned by an independent contractor based on volume or value are illegal "remuneration" under the statute and therefore fraudulent claims to boot. *See Mallory*, 988 F.3d at 738.

In sum then, it would violate the Anti-Kickback Statute, and therefore violate the False Claims Act, to pay a medical-device salesperson by commission per sale or based on the value of sales and get paid back in federal healthcare money; any such sale under that scheme would be a false claim. That is the gist of what Nicholson is trying to allege here.

Now to the pleading standards. Normally when considering Rule 12(b)(6) motions to dismiss, we look to our familiar plausibility standard, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but because False Claims Act claims are fraud claims, a higher standard applies: Fraud-based claims must be pleaded with particularity, *Grant*, 912 F.3d at 196; *see* Fed. R. Civ. P. 9(b). Because all False Claims Act claims must be linked in some way to presenting a claim for payment to the government this particularity requirement applies to that presentment element. *Grant*, 912 F.3d at 197. There are two ways to show presentment with particularity: either by alleging a representative example describing "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby"; or by alleging a "pattern of

13

conduct that would *necessarily* have led to submission of false claims." *Id.* (cleaned up).[8]

When the claim hinges on an underlying kickback violation, the kickback scheme must be pleaded with particularity as well. *See Nathan,* 707 F.3d at 458 ("[O]ur pleading requirements do not permit a relator to bring an action without pleading facts that support all the elements of a claim."); *see also United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1166 (8th Cir. 2019).

This particularity requirement is often called the fraud's "who, what, when, where, and how." *See Wilson*, 525 F.3d at 379 (quoting *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)). We require that detail to prevent frivolous suits, stop fraud actions where everything is learned after discovery (i.e., fishing expeditions), and to protect defendants' reputations. *Id.*; *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280–81 (4th Cir. 2014). While we require significant detail, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784, 789.

---

[8] The district court noted some confusion among district courts in our Circuit on whether a representative example must be pleaded with particularity to make out a False Claims Act claim under Rule 9(b). *Grant* tells us that there are two ways to show presentment with particularity, and only one requires a representative example. 912 F.3d at 197. The second option requires only that "a plaintiff can allege a pattern of conduct that would *necessarily* have led to submission of false claims to the government for payment," even where we do not have particularized detail about any one such claim. *Id.* (cleaned up). So while there may have been confusion, there was and is no open question on this issue in the Fourth Circuit.

14

Nicholson's Original Complaint simply does not meet the high standards of particularity required by Rule 9(b)—and may not even meet Rule 8's lower plausibility standards—so the district court was right to dismiss the Complaint. Much of what is said in the Original Complaint is classic conclusory language. To say that "representatives were paid by Jeff Turpin . . . for furnishing items covered by federal healthcare programs and received commissions based on the same" is in essence just a restatement of the legal standards we outlined above, plus the owner's name. Adding the name of the products helps, but more than that is required to satisfy Rule 9(b). Unlike the Amended Complaint which gave some detail about the payment breakdown—75/25 split between the companies and then a 60/40 split of MedCom Inc.'s share between it and its representative—this first Complaint includes no information about how the payments were split up or how representatives were paid. It also provides no detail about the actual inducement of sales, whether and how representatives were supposed to push the product. All this amounts to not much more than saying that they were using commissioned salespeople to submit false claims, a legal conclusion.

Nicholson does offer some support for how he knew about the scheme: "based upon his employment with Integra whereby these representatives engaged in national competitions with the full-time employees," by talking to treating physicians and reimbursement personnel, and by "receiv[ing] compensation for these 1099 nonemployee's role in generating these sales." But none of that pushes this Complaint much further along. Claiming to know something based on working in an undisclosed role at the relevant company, based on discussions with unnamed people, and based on participation in

15

vaguely described events cannot make a series of conclusory legal statements into a particularized allegation.

Now to the offered representative claim—the Holloway example—which is only slightly less nebulous than the general allegations. Nicholson claims in one sentence that "Patient T. W. received an Integra Dermal Replacement Therapy graft furnished by Relator's 1099 counterpart/sales representative Holloway whereby VA care benefits paid for this graft utilized by Dr. Phillips in excess of $3,000.00." J.A. 15. So much detail is missing from this allegation that it sounds like a neighbor's conversation only half overheard through the walls. The patient is unknown, the first names of the other two participants are unknown, who submitted the claim is unknown, who was paid the $3,000 is unknown, whether it was $3,000 or much more than $3,000 is unknown, what VA hospital in what state is unknown (how many Dr. Phillips are there in the country?), and so on. The unknowns swamp the knowns. And while there is discussion of some payment, there is no discussion of the most important detail: a submitted false claim. This story simply does not give us any confidence that Nicholson "has substantial prediscovery evidence of [these] facts." *Harrison*, 176 F.3d at 784.

Nicholson argues that the district court erred by suggesting that the representatives worked for Integra and not MedCom Inc. and by making too much of the confusion between MedCom Inc. and MedCom LLC. But confusion about which corporate entity was involved matters when pleading particularity is required. And even disregarding Nicholson's conflation, we find that there was not enough offered in the Original Complaint to make out a claim with the particularity required by Rule 9(b).

16

In these Rule 9(b) cases, the particularity standard is steep. For future relators, it may be wise to err on the side of saying too much to avoid a kick from Rule 12(b)(6). The Original Complaint here needed more to scale that wall. The district court was right to dismiss the Original Complaint for a lack of particularity.

### 2.      With-Prejudice Dismissal

Next, the district court did not abuse its discretion by dismissing the Original Complaint with prejudice. In the Fourth Circuit, district courts are not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 292 (4th Cir. 2018). In this Circuit, plaintiffs do not get a dry run as a matter of right. District courts have inherent power to manage their dockets with an eye toward speedy and efficient resolutions, *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016), and part of that power is the use of with-prejudice dismissals. So we review decisions about the nature of a dismissal—even a very first dismissal—for an abuse of discretion. *Adbul-Mumit*, 896 F.3d at 292. And we see no reason to question the district court's discretionary decision here to dismiss the plainly insufficient federal causes of action with prejudice.

The district court also dismissed a fifth and final claim, this one under the North Carolina False Claims Act. Because the state-law claim was the only thing left after the dismissal of all the federal-law claims, the district court had the discretion to decline to exercise supplemental jurisdiction over that claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)). But the court's order might be read to dismiss that claim with prejudice along with the federal claims. *See* J.A. 119

17

(dismissing the whole case with prejudice). Because the district court declined to even take jurisdiction over the state-law claim, it could not have and did not adjudicate the merits of the claim, so that dismissal should have been without prejudice. *See Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 316–17 (4th Cir. 2001). So we affirm the dismissal of the state-law claim, but we modify the order to clarify that Count V was dismissed without prejudice.

### 3.      Denial of Leave to Amend

Nicholson next argues that even if the False Claims Act counts were properly dismissed with prejudice, the district court should have at least granted his post-judgment motion for leave to amend to fix the Original Complaint's deficiencies. But denials of leave to amend are also reviewed for an abuse of discretion, *Laber v. Harvey*, 438 F.3d 404, 428 (4th Cir. 2006), and again, we find that the district court did not abuse its discretion.

Under the Federal Rules, a court "should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). In putting that rule into effect, we have often described our Fourth Circuit policy as one to "liberally allow amendment." *See, e.g.*, *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). And our policy furthers a wider federal policy of—when possible—resolving cases on the merits, instead of on technicalities. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369, 379 (4th Cir. 2012); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). While we generally encourage amendment, there are, of course, circumstances that justify denying a plaintiff the opportunity to try again. We have laid out three such justifications for denying leave to

18

amend:  prejudice to the opposing party, bad faith, or where the amendment would be futile. *Laber*, 438 F.3d at 426 (citing *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).  Delay alone is not enough to deny leave to amend, though it is often evidence that goes to prove bad faith and prejudice.  *See Johnson*, 785 F.2d at 509–10.

At first glance, there seems a tension in this doctrine.  Abuse-of-discretion review suggests district courts have free range, but a liberal policy of amendment and a narrow list of permissible reasons to deny amendment looks like a short leash.  But the tension is fleeting. An abuse of discretion is where the judge has acted in an arbitrary or irrational manner, where he has completely failed to consider the right factors, or where he relied on faulty legal or factual premises.  *United States v. Welsh*, 879 F.3d 530, 536 (4th Cir. 2018). At bottom, it is a standard of deference, where the trial judge "will not be reversed simply because an appellate court disagrees."  Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 754 (1982); *see also Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) ("At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.").  So in this context, it would be an abuse of discretion for the district court to fail to identify which of the three permissible reasons to deny amendment it relied on or to fail to give any reasons at all—unless, of course, its reasons "are apparent," *see Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 194 (4th Cir. 2009)— but within those three categories, a judge only abuses his discretion when he steps outside the bounds of reasonable disagreement, *see Evans*, 514 F.3d at 322.  Put simply, an abuse

19

of discretion is when the district judge is "fundamentally wrong." *Bluestein v. Cent. Wis. Anesthesiology, S.C.*, 769 F.3d 944, 957 (7th Cir. 2014).

One last point on the standard: The same legal standards apply to both pre- and post-judgment motions to amend. *Laber*, 438 F.3d at 427. Either before or after a judgment is entered, a district court should deny amendment only where there is prejudice, bad faith, or futility. But while the legal standard is the same, courts will reasonably deny a higher number (perhaps a much higher number) of post-judgment motions to amend like the one here. As we have said, delay may not be enough by itself to deny leave to amend, but prejudice will naturally be much easier to show and bad faith will seem more plausible the more time has passed between a first attempt and a proposed amendment. *Id.*[9]

The district court denied amendment because of a finding of bad faith. A few words on bad faith. We cannot provide a comprehensive definition of a term like bad faith; in truth, it is a difficult term to define without retreating to circular reasoning or just listing examples. *See* Constance A. Anastopoulo, *Bad Faith: Building a House of Straw, Sticks, or Bricks*, 42 U. Mem. L. Rev. 687, 696 (2012) (explaining how, in the insurance context, courts often describe "bad faith" as the opposite of "good faith"); Kenneth S. Abraham & Daniel Schwarcz, *Insurance Law & Regulation* 91–92 (6th ed. 2015) ("It is extremely difficult to specify the kind of behavior that triggers the bad faith cause of action. . . . [I]t may be that each case requires a judgment in context."). As the Restatement (Second) of

---

[9] Beyond that practical difference, we note there is also a procedural difference between the pre- and post-judgment motion to amend: "[T]he district court may not grant the post-judgment motion unless the judgment is vacated pursuant to Rule 59(e) or . . . 60(b)." *Laber*, 438 F.3d at 427.

Contracts says, "a complete catalogue of types of bad faith is impossible."  § 205 cmt. d (Am. Law Inst. 1981); *but see Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (offering a nine-factor test to determine whether a patent infringer was operating in bad faith).

Black's Law Dictionary defines "bad faith" as "[d]ishonesty of belief or purpose." *Bad Faith*, *Black's Law Dictionary* (8th ed. 2004).  To act with a dishonesty of purpose is to act for the wrong reasons.  It may be outright lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, or stubbornly refusing to follow rules—you can imagine cases where a party just wants to cause chaos—or it might be something as mundane as noticing someone's mistake and saying nothing about it.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 52 cmt. c & illus. 3 (Am. Law Inst. 2011).  In the contract context, courts have found bad faith for "evasion of the spirit of the bargain, lack of diligence . . . , willful rendering of imperfect performance, abuse of a power . . . , and interference . . . or failure to cooperate."  Restatement (Second) of Contracts § 205 cmt. d.  We could go on, but this sketch of the contours of this many-faceted concept suffices here.

And remember, we review the district court's finding for abuse of discretion.  So we must determine whether the district court's decision that the amending party acted in bad faith is outside the realm of reasonable disagreement.

Now to these facts.  The district court offered several reasons for the bad-faith finding, and we do not find that there was an abuse of discretion, especially when viewing its reasons together.

First, the district court suggested that Nicholson withheld facts and evidence that he knew before filing the original Complaint, without satisfactory explanation. The district court's opinion rightly notes that parties have a duty to introduce important evidence on which they intend to rely as soon as reasonably possible in the litigation. And when a party withholds evidence for an extended period, it is not unreasonable for a district court to presume bad faith, at least where no satisfactory explanation is given for the delay. *See First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 314 (4th Cir. 1982); *see also* 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1488 (West 3d ed. 2022). And here, Nicholson waited years to amend the original Complaint with additional facts. The district court here found that the facts were withheld—i.e., the facts were known at the time of the filing of the Complaint— and that no satisfactory explanation was provided. Counsel for Nicholson admitted in oral argument before this Court that almost all the details added to the Amended Complaint were known to Nicholson when the original Complaint was filed. Oral Arg. 9:01. Holding back important details without justification may not always be evidence of bad faith, but that move is especially dodgy in a case like this where Rule 9(b) requires particularity, in part, to put defendants on notice of exactly what it is they are being accused of. *See Harrison*, 176 F.3d at 784. While that is not undeniable evidence of skulduggery, neither

22

can we say that the district court was unreasonable to cite this holding back of important facts as evidence of bad faith.[10]

Next, even though the district court had held there was no private cause of action under the Anti-Kickback Statute, and even though Nicholson conceded there was no private cause of action under the Anti-Kickback statute, Nicholson still insisted on including a standalone Anti-Kickback Statute claim as Count IV of his proposed Amended Complaint. The district found this to be more evidence of bad faith: "[P]ursuing claims with the knowledge they are not supported by law—cannot be classified as good faith conduct." J.A. 221 (cleaned up). Maybe this inclusion was a mistake by Nicholson's counsel—perhaps a mistaken copy/paste which many of us can relate to or perhaps an innocent confusion about the law[11]—but at least on the record as we see it, this is a question

---

[10] Because the district court denied Nicholson leave to amend for both bad faith and futility, Nicholson was in a tough spot on appeal, having to argue both that the Amended Complaint had changed enough to be sufficiently particular and also, to rebut the claim of bad-faith withholding of evidence, that the only new facts added to the Amended Complaint were "immaterial"—which all but concedes the first issue of whether the Amended Complaint fixes the particularity problem. But we do not agree that the facts added to the new Complaint were immaterial. They were not just adding first names or saying it was the Durham VA. Nicholson added details of conversations with the two main characters in the story, Turpin and Holloway; he added more detail about his knowledge of Integra and the companies' relationships; and he added a detailed percentage-by-percentage breakdown of how the payment was split between the companies and their employees. While the Amended Complaint likely did not do enough to scale the wall of Rule 9(b), we cannot agree that all the facts added were immaterial.

[11] Nicholson argues in his briefing to this Court that the Anti-Kickback claim in Count IV was included in the Amended Complaint "out of an abundance of caution," just in case the new Complaint was resealed, and the United States Government revisited its decision to intervene in the qui tam suit. Br. of Appellant 31.

on which reasonable people might disagree. So the district court justifiably pointed to this as more evidence of bad faith.

The district court also suggested that Nicholson "change[ed] substantive facts from one filing to the next" to avoid dismissal. J.A. 220–21. And "misleading and inconsistent assertions" sometimes reveal bad faith. *Adbul-Mumit*, 896 F.3d at 293 n.7. It is unclear whether the two complaints here are truly inconsistent. As we discussed above, there is at least some ambiguity in the Original Complaint about who the 1099 representatives worked for and where all their payment came from. Paragraph 16 of the Original Complaint is, frankly, confusing. We might tease out a reading that aligns with the Amended Complaint. But that reading is surely not required. And however generous we might be, the briefs and opinions below suggest that Defendants and the district court were both confused on this point. So at best for Nicholson, the statements were merely misleading instead of both misleading and inconsistent, which is not exactly a neon sign of good-faith lawyering.[12]

Taking all the court's arguments together, the district court's bad-faith finding was within the bounds of reasonable disagreement, and we find no abuse of discretion. Because we find that the district court did not abuse its discretion in finding bad faith, we can affirm

---

[12] The court noted briefly that Nicholson breached local rules about appropriate citations, and that this supported a finding of bad faith. At first blush, that comment seems to cut against our policy that—at least when it comes to leave to amend—minor technicalities should not stand in the way of reaching the merits. *See Mayfield*, 674 F.3d at 379. But the rule that was violated here was a rule against paraphrasing facts from the Complaint without citing to them. That error is particularly suspect in a Rule 9(b) case that requires particularity. Especially when added to the concerns about withholding of evidence and shifting allegations, the court's concern with Nicholson's refusal to cite his factual allegations was not an abuse of discretion.

the district court on that ground, and we need not discuss the possibility that the Amended Complaint would have been futile.

*      *      *

Nicholson failed to make his allegations in the Original Complaint with the particularity Rule 9(b) requires, so the district court was right to dismiss the Original Complaint. From there, the district court had discretion both to dismiss the federal claims with prejudice and to deny Nicholson leave to amend for bad faith. We see no abuses of that discretion on this record. But because the district court did not take jurisdiction over the state-law claim, we modify the decision to clarify that the state-law claim should be dismissed without prejudice. So the district court is

AFFIRMED AS MODIFIED.