In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2619

RANDALL ARTIS,

*Plaintiff-Appellant,*

*v.*

ADRIAN SANTOS,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 16-cv-108 — **Theresa L. Springmann**, *Judge.*

ARGUED DECEMBER 1, 2023 — DECIDED MARCH 8, 2024

Before WOOD, ST. EVE, and LEE, *Circuit Judges.*

ST. EVE, *Circuit Judge*. During his tenure as a city councilman for East Chicago, Indiana, Randall Artis earned a felony conviction for misappropriating public money for personal political gain. He returned to public service years later, this time as a junior clerk in the city clerk's office. But not for long—after just six months, he was out of a job.

Artis sued his boss, Adrian Santos, alleging that Santos fired him in retaliation for Artis exercising his First Amendment free speech rights. Santos maintained that he fired Artis for the criminal conviction. The case went to trial, and a jury found for Santos.

Artis now seeks a new trial. He argues that the district court erroneously admitted the testimony of an expert witness, denied him an impartial jury, and issued inaccurate and confusing jury instructions and verdict forms. He also questions the jury's verdict. We find no error or reason for a new trial and affirm.

## I. Background

### A. Factual Background

Between 1995 and 2005, Randall Artis served as a city councilman for the City of East Chicago, Indiana. His tenure ended in a felony conviction: In 2005, Artis pled guilty to stealing up to $1.5 million from the city in what East Chicagoans call the "sidewalk scandal." Artis, along with several other city politicians, used millions in public funds to finance unapproved repairs on his constituents' private property. He received a 27-month prison sentence for that offense.

Artis returned to public service in August 2015, when Mary Leonard, then East Chicago's city clerk, hired him as a junior clerk. Leonard, however, was on her way out of the clerk's office. A new city clerk, Adrian Santos, replaced her as city clerk after winning an election that fall.

Before taking office, Santos explored the possibility of implementing new professionalism standards within the clerk's office. These new standards primarily involved running background checks on all employees to ensure that each qualified

under the city's existing crime insurance policy. That policy excluded coverage for acts of employees who had previously committed "theft" or "any other dishonest act." Santos believed that the city's insurance policy would not cover an employee previously convicted of a felony.

Santos assumed office in January 2016. Shortly thereafter, he asked Artis to support the campaigns of two political candidates—Mike Repay, who was seeking reelection as Lake County Commissioner, and Marissa McDermott, who was running for Lake County Circuit Court Judge. Santos wanted Artis to take Repay and McDermott through the West Calumet Housing Complex to secure voter support there. But Artis rebuffed Santos's overtures and declined to lend his help to the campaigns.

Santos fired Artis on February 1, 2016. He explained the decision in two termination letters dated February 1, 2016, and February 4, 2016. The February 1 letter stated that Artis was losing his job because of his prior felony conviction. The February 4 letter further explained that Santos had adopted new professionalism standards for the clerk's office, which required all employees to meet the criteria for bonding. The letter informed Artis that his prior conviction precluded him from satisfying the bonding requirements, meaning that the clerk's office could no longer employ him.

**B. Procedural Background**

Artis sued Santos and the City of East Chicago under 42 U.S.C. § 1983 for violating his constitutional rights, claiming that Santos fired him in retaliation for exercising his First Amendment right to free speech—namely, for refusing to support Repay and McDermott. His five-count complaint also

raised a due process claim against Santos and a disparate impact claim against the City of East Chicago under 42 U.S.C. § 2000e-2(e). Only the First Amendment claim against Santos survived summary judgment, and Artis proceeded to trial on it.

Several happenings at trial are relevant to this appeal.

During voir dire, a prospective juror allegedly made a racially controversial statement on her juror questionnaire. That questionnaire is not in the record. From what we can surmise, though, the juror expressed some disagreement with the view that Black men undeservedly suffer disproportionately at the hands of law enforcement. Artis, who is Black, moved to strike the prospective juror for cause, but the court denied his request after determining that the juror could act impartially. The court ultimately impaneled that juror.

At trial, and over Artis's objection, the district court permitted Santos to call Roosevelt Haywood to testify as an expert witness. Haywood headed a business that provided risk management consultation and insurance brokerage services to municipalities and private entities. He primarily testified about the risks of Artis's continued employment to the city, opining that it would be both costly and risky for the city to employ a convicted felon like Artis in a junior clerk position.

After the close of evidence, Artis objected to the court's jury instruction setting forth the elements of his First Amendment retaliation claim. He also objected to one of the court's verdict forms, which asked the jury to make findings of fact on the elements of the claim. Artis argued that both the instruction and verdict form were misleading and confusing. The court denied his objections, reasoning that Artis had not

explained why the language was confusing, and that the instruction and verdict form accurately stated the law.

The jury returned a verdict in Santos's favor. Artis later moved for a new trial under Rule 59 and for judgment as a matter of law under Rule 50(b). Relevant here, the targets of Artis's Rule 59 motion included Haywood's testimony, the allegedly biased juror, and the court's jury instructions and verdict form.

The district court denied both motions, rejecting each claim of error. This appeal followed.

## II. Analysis

Artis raises several issues on appeal: (1) whether the district court improperly admitted expert testimony from Roosevelt Haywood, (2) whether the court erred in denying his for-cause challenge to the allegedly biased prospective juror, (3) whether the court issued confusing and misleading jury instructions and verdict forms, and (4) whether the jury's completed verdict forms were inconsistent. We take each in turn.

### A. Expert Testimony of Roosevelt Haywood

We begin with Artis's argument that the district court erred in allowing Roosevelt Haywood to testify as an expert witness. Federal Rules of Evidence 702 and 403 guide this claim.

Rule 702 governs the admissibility of expert testimony in federal court. *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023). The rule provides that a qualified expert witness may offer an opinion only if the proponent demonstrates that: (a) the expert's scientific, technical, or other specialized knowledge will be helpful to the jury; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts. Fed R. Evid. 702. As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, Rule 702 imposes a gatekeeping responsibility on district courts to ensure that any proposed expert testimony "is not only relevant, but reliable." 509 U.S. 579, 589 (1993). We give district courts "substantial latitude in making the findings necessary to fulfill this gatekeeping role." *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 772 (7th Cir. 2021) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)).

Additionally, Rule 403 allows a court to exclude even relevant evidence, including expert testimony, "if its probative value is substantially outweighed by the danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Artis challenges the admission of Haywood's testimony on various grounds. Where, as here, there is no dispute that the court properly applied the correct legal framework (including Rule 702 and the Supreme Court's decision in *Daubert*), we review the court's decision to admit the expert testimony for an abuse of discretion. *See Anderson*, 61 F.4th at 508. "Under that standard, '[s]o long as the district court adhered to *Daubert*'s requirements, we shall not disturb the district court's findings unless they are manifestly erroneous.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021) (quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607–08 (7th Cir. 2006)).

As a preliminary matter, Santos insists Artis waived this argument, but we do not agree. Artis objected to Haywood's expert testimony before and at trial. Before trial, Artis filed a *Daubert* motion, which the district court denied. At trial, he objected twice more. The first trial objection was a prolonged recital of his *Daubert* motion, to which the court remarked that it had "previously ruled on this matter" and would therefore "incorporate by reference … the plaintiff's repeated motion." The second trial objection came moments later in response to defense counsel's request to qualify Haywood, with Artis's counsel noting that he "d[id] object," but wouldn't "rehash" the objection from minutes before. Santos seizes on this latter objection as too general and unspecific to preserve his arguments on appeal. But Artis did not make this objection in a vacuum—his several earlier objections left no doubt as to the "specific grounds" for challenging Haywood's testimony and preserved the issue for appeal.[1] *United States v. Carson*, 870 F.3d 584, 602 (7th Cir. 2017).

### 1. Reliability

We therefore turn to the merits, beginning with Artis's contention that the district court abused its discretion by finding Haywood's testimony reliable.

Haywood opined that Artis represented an increased insurance risk to the city because his felony conviction excluded him from coverage under the city's crime insurance policy. Artis primarily challenges that testimony as unreliable because it stemmed from Haywood's personal industry

---

[1] We find Santos's waiver argument particularly brazen given that defense counsel at trial affirmatively agreed that the "issue was raised earlier by [Artis's counsel] pursuant to *Daubert*."

experience, rather than scientific methodology or empirical data. But by now it is no secret that an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact—experience is an equally valuable teacher. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *United States v. Parkhurst*, 865 F.3d 509, 516–17 (7th Cir. 2017) ("Training and experience are proper foundations for expert testimony. We have repeatedly allowed such expert testimony without requiring 'scientific methodologies' or 'peer review.'" (citations omitted)); Fed. R. Evid. 702 advisory committee's notes (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Haywood appropriately based his testimony on nearly 40 years of experience as an insurance and municipal risk-management professional. None of the things his testimony allegedly lacked—error rates, levels of acceptance, peer-reviewed data, and the like—are prerequisites to reliability.

Nor can we characterize Haywood's testimony as unsupported *ipse dixit*. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (noting that expert testimony may not be "based on subjective belief or speculation"). Haywood ultimately concluded that Artis was "a risk the City of East Chicago need not take on" and that his presence would cause "unnecessary additional expense at the least or an uncovered exposure at best." But he did not pluck these conclusions out of thin air. Rather, he considered Artis's criminal background and the city's crime insurance policy to determine that the policy excluded Artis. He then leaned on his extensive risk-management experience to explain that this either (1) exposed

the city to the risk of having to pick up the tab if Artis committed another crime, or (2) subjected the city to higher insurance premiums.

In short, Haywood reached his conclusions after reviewing the record, consulting his significant insurance and risk-assessment experience, and applying basic underwriting principles. All this provided ample foundation for his opinions.

Artis also faults Haywood's report and trial testimony for consulting informal sources. He challenges Haywood's reliance on an article from "chron.com" titled "What disqualifies a person from getting bonded for an insurance job?," and a screenshot from "JustAnswer.com" addressing the question "can u obtain a surety bond if you have a felony." Both sources purportedly bolstered Haywood's conclusion that Artis would not qualify for bonding because of his felony conviction.

Artis confuses the weight of Haywood's testimony with its admissibility. Although these sources may not carry much gravitas, "[a] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). After the *Daubert* threshold, "the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" will do. *Id.* (quoting *Daubert*, 509 U.S. at 596). The legitimacy of these websites and criticisms of Haywood's reliance on them are fodder for cross-examination, not grounds for exclusion. The district court appreciated this distinction. It did not err by admitting the testimony while permitting Artis's counsel to attack these sources on cross-examination.

**2. Remaining Arguments**

Artis's additional complaints about Haywood's testimony are underdeveloped (and so waived) and also fail on the merits.

*Impermissible Credibility Vouching.* Artis claims that Haywood impermissibly testified as to the credibility of an insurance company employee who had testified earlier at trial. Yet he does not refer to any offending statement in Haywood's testimony nor explain how Haywood vouched for the witness's credibility. He has therefore waived the argument. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718–19 (7th Cir. 2012) (arguments may be waived if "underdeveloped, conclusory, or unsupported by law"). Waiver aside, nothing in Haywood's testimony comes close to improperly bolstering a prior witness's credibility.

*Exceeding the Scope of Disclosure.* The same fate awaits Artis's conclusory assertion that Haywood impermissibly testified on undisclosed matters. *See* Fed. R. Civ. P. 26(a). Artis does not bother to delimit Haywood's remit, nor explain how his testimony extended beyond it. We will "not fill this void." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 842 (7th Cir. 2010). Artis offers nothing, so he waives the argument.[2]

---

[2] At oral argument, Artis suggested that Haywood's testimony impermissibly touched on the subject of bonding. But we cannot say bonding was squarely out of bounds, especially absent a contemporaneous objection to the district court. Santos disclosed his intent for Haywood to speak to the risk management practices of insurance companies with respect to convicted felons. Bonding and business liability insurance frequently go

*Prejudice.* Artis last contends that Haywood's testimony was irrelevant and unduly prejudicial, in violation of Rule 403. The argument is once again fatally skeletal. Besides that, we have no doubt that Haywood's opinions were relevant and probative. This case was about the supposed retaliatory firing of a convicted felon. Haywood spoke to the legitimate, non-retaliatory rationale for terminating Artis from a risk-management perspective. Artis provides no explanation for how the danger of unfair prejudice possibly outweighed the probative value of this testimony. The district court did not abuse its discretion in admitting Haywood's testimony, especially considering the "special deference" we extend to the district court's findings under Rule 403. *United States v. Eads*, 729 F.3d 769, 776 (7th Cir. 2013) (quotation marks omitted).

## B. For-Cause Challenge to Prospective Juror

Artis's second argument concerns the district court's denial of his motion to strike a prospective juror for cause. The parties dispute the adequacy of the record for purposes of appeal, so we address that first. Seeing no obstacle, we turn to the merits and find no error on the part of the district court.

### 1. Adequacy of the Record

The factual basis for Artis's challenge is muddled. According to Artis, a prospective juror made a "derogatory statement as to black men" in her juror questionnaire. Although the record does not contain that questionnaire, the district court supplied (at least part) of the juror's statement in a written ruling:

---

hand in hand, just as they did in Haywood's extensive experience in both fields.

> In response to a question [on the juror question-
> naire] asking for additional comments, the juror
> wrote, "I don't agree with the thinking that too
> many black males are targeted or treated in-
> justly [sic] because of their color, particularly if
> the geographical area is primarily black."

Both parties stipulate that the court's statement accurately reflects at least part of the juror's questionnaire response. Artis nonetheless insists that this statement does not tell the full story and is insufficient to review his claim. This position leaves us perplexed: the court's statement *allows* us to consider Artis's claim. Without it, the record would be inade-quate and we would go no further. *See LaFollette v. Savage*, 63 F.3d 540, 544 (7th Cir. 1995) ("[D]ismissal is the appropriate course if the absence of a complete record precludes meaning-ful appellate review.").

Additionally, Artis never asked this court to supplement the record, even after the district court directed him to "pre-sent his motion to the Seventh Circuit Court of Appeals for disposition." *See* Fed. R. App. P. 10(e)(3). His failure to follow those marching orders means we proceed without the ques-tionnaire. Even so, since the parties agree that the district court's opinion accurately reflects at least part of the juror's statement, we may address the merits of Artis's claim.

### 2. Merits

Civil litigants enjoy a constitutional right to a fair trial. *See Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993). Part and parcel of that constitutional imperative is an impartial jury, one "capable and willing to decide the case solely on the evi-dence before it." *Marshall v. City of Chicago*, 762 F.3d 573, 575

(7th Cir. 2014) (citing *McDonough Power Equip., Inc. v. Green-wood*, 464 U.S. 548, 554 (1984)). The *voir dire* process aims to secure such a jury through inquisition, whereby the court and parties can ferret out potential jurors whose unshakable biases compromise their abilities to act as neutral arbiters. "If a prospective juror's responses to *voir dire* questioning reveal a bias so strongly as to convince the judge that the juror cannot render impartial jury service, the judge should dismiss the juror for cause." *Id.* (citing *United States v. Brodnicki*, 516 F.3d 570, 574 (7th Cir. 2008)).

Not every preconception or whiff of bias disqualifies a potential juror. Rather, recognition of the human condition requires us to accept that "[e]veryone brings to a case a set of beliefs that may incline him in one direction or another." *Thompson v. Altheimer & Gray*, 248 F.3d 621, 625 (7th Cir. 2001). "To account for that reality while also ensuring the protection of each litigant's constitutional rights, we have endorsed a two-step process to assist district judges in determining which prior beliefs warrant for-cause dismissal and which do not." *Marshall*, 762 F.3d at 576. First, the court must assess whether a prospective juror manifests a prior belief that is both "material and 'contestable,' meaning a rational person could question its accuracy." *Id.* (quoting *Thompson*, 248 F.3d at 627). Immaterial and uncontestable beliefs prejudice no one and are not, strictly speaking, "biases." *Id.* Second, the court must determine "whether the juror is capable of suspending" her material and contestable belief "for the duration of the trial." *Id.*

Ultimately, we review a claim that the district court erroneously denied a for-cause challenge for an abuse of discretion, which in this context is "highly deferential." *See United*

*States v. Taylor*, 777 F.3d 434, 440 (7th Cir. 2015) (citing *United States v. Allen*, 605 F.3d 461, 464 (7th Cir. 2010)). The trial judge can best assess juror credibility and demeanor from her close perch. That leaves us disinclined to disturb her judgment when she has determined that a juror can act impartially.

The district court did not abuse its discretion in denying Artis's for-cause challenge to the prospective juror. Even assuming the juror's freighted statement on her questionnaire satisfied the first step—i.e., was both "material" and "contestable"—the court was well within its discretion in concluding that she could suspend her beliefs at trial.

The prospective juror offered the district court repeated and unwavering commitments that she could set her biases aside:

> THE COURT: Understanding that it is the responsibility and a duty of a juror that, at the end of the case, that you would review the evidence that has been presented and put in the record and take the Court's instructions of law and apply those instructions to the facts as you find them from the evidence in the case, would you be willing and able to follow the Court's instruction of law in that way?
>
> JUROR: Yes, I could.
>
> THE COURT: Do you have any hesitancy in that?
>
> JUROR: No.
>
> THE COURT: Would you be able to put aside any opinions or—any opinions you may

otherwise hold with regard to the legal system, would you be able to put those aside in reviewing the evidence in this case and in applying the Court's instructions of law to those facts?

JUROR: Right. I wouldn't have a problem with that.

The court then turned things over to Artis's counsel:

COUNSEL: [C]ould you explain the statement that you wrote on your questionnaire as to black males.

JUROR: Right. I work in a school. I don't believe that—I do believe there are sometimes people overcharged or overfocused on. However, I don't feel that we should say there's too many black males charged with crimes when we need to go through the legal system and find out if they've done 'em. I worked in a school that was all African American, and there are kids that make good choices and those who make bad choices. It had nothing to do in that school with the color of their skin.

COUNSEL: Okay. But you added something about the area in—the geographical area in which they live. How does that tie in?

JUROR: Well, because where I worked was predominantly African American. So there was going to be, you know, more kids charged or focused on, those negative behaviors and choices, because it was all African American. So it wasn't

like it was going to be higher for that rate be-
cause they all lived there. This is what it was.

COUNSEL: Were you saying that black males
that live around other black males are more
likely to commit a crime?

JUROR: No. I'm just saying you can't say
that's—in that area, that there's more blacks fo-
cused on than anything else. That's what it
was—That was who lived there.

COUNSEL: But then you realize that Mr. Artis
is black[,] right?

JUROR: I do.

COUNSEL: And is that going to get in the way
of your decision-making?

JUROR: No. It's based on whether or not the ev-
idence shows he did it or not. I'm not going to
be hesitant to make that choice based on the ev-
idence.

After hearing these responses and adequately exploring
any potential bias, the court concluded that the juror "didn't
seem to be hiding anything." This kind of credibility determi-
nation rests "peculiarly within [the] trial judge's province."
*Allen*, 605 F.3d at 466 (quoting *Wainwright v. Witt*, 469 U.S. 412,
428 (1985)). Nothing in the record gives us reason to doubt the
court's appraisal.

Artis compares this case to *United States v. Lacey*, but that
case dealt with a different issue—the effects of a juror's preju-
dicial remarks heard by other prospective jurors. 86 F.3d 956,
969 (10th Cir. 1996). Here, in contrast, the remarks at issue

appeared on a juror questionnaire shared only with counsel and the district court. We think the more apt point of reference is this court's decision in *Marshall*. 762 F.3d at 577. There, like here, the court credited the juror's "unwavering affirmation[s]" that any preconceptions would not affect her judgment. *Id*. As in *Marshall*, we defer to the discretion of the district court.

## C. Jury Instructions and Verdict Form

Artis's next arguments challenge the verdict form and jury instructions. He contends that the district court erred in opting for a special verdict form, and that it provided the jury with confusing instructions.

### 1. Jury Instructions

Our review of a court's jury instructions "is twofold." *United States v. Haldorson*, 941 F.3d 284, 297 (7th Cir. 2019). First, we review a given instruction de novo to determine whether it fairly and accurately states the governing law. *Cotts v. Osafo*, 692 F.3d 564, 567 (7th Cir. 2012). Second, we evaluate the district court's phrasing of an instruction for abuse of discretion. *Antrim Pharm. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 428 (7th Cir. 2020). Inaccurate or confusing instructions warrant a new trial only if the losing party shows that the error prejudiced him. *Jimenez v. City of Chicago*, 732 F.3d 710, 717 (7th Cir. 2013).

Artis takes issue with the instruction laying out the elements of his First Amendment retaliation claim. Specifically, he challenges the third element:

> Defendant's belief that Plaintiff refused to campaign for Michael Repay and Marissa McDermott was a reason that Defendant terminated

Plaintiff's employment. It need not be the only reason.

Artis insists that the phrase "Defendant's belief" adds an unnecessary layer of analysis because it "does not matter what the Defendant believed."

We disagree. The defendant's belief that the plaintiff engaged in protected speech *does* matter in a First Amendment retaliation claim. As the Supreme Court explained in *Heffernan v. City of Paterson*, "[t]he government's reason for [the retaliatory conduct] is what counts" in such a claim, "even if … the employer makes a factual mistake about the employee's behavior." 578 U.S. 266, 273 (2016); *see also DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021). The phrase "defendant's belief" in the instruction is necessary to focus the jury on the defendant's understanding of the facts, rather than on what may have actually occurred.

Moreover, as Artis concedes, the court adopted the instruction from the Seventh Circuit Pattern Jury Instructions, which are "presumed to accurately state the law." *United States v. Foy*, 50 F.4th 616, 623 (7th Cir. 2022) (quoting *United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019)); *see also* Seventh Circuit Pattern Civil Jury Instruction 6.03 (2017). That presumption holds here.

Nor can we describe the court's instruction as misleading, despite Artis's complaints that it created more confusion than clarity. Asking the jury to enter the mind of the defendant is hardly a novelty—courts routinely task juries with deciphering intent. Questions of motivation and belief are well within their ken. And while Artis protests that the instruction

contains a "grammatical sequence flaw," he fails to identify the flaw and we find none.

At best, the defendant's belief as to what happened was unimportant in this case because there was no discrepancy between that belief and what transpired—i.e., there was no dispute that Artis refused to campaign for Repay and McDermott. The district court thus might well have issued the alternative formulation of the pattern instruction, which omits reference to the defendant's belief and simply asks the jury to determine whether the plaintiff's speech was a reason the defendant retaliated. *See* Seventh Circuit Pattern Civil Jury Instruction 6.03 (2017). That decision, however, was up to the district court, which has "substantial discretion as to the precise wording of the instructions so long as the final result, read as a whole, completely and correctly states the law." *Karahodzic v. JBS Carriers, Inc.*, 881 F.3d 1009, 1016 (7th Cir. 2018) (citing *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013)). The district court's choice to opt for the more specific and equally accurate instruction here did not exceed that discretion.

### 2. The Verdict Forms

Next comes Artis's challenge to the court's verdict forms, which the court titled "A" and "B." Verdict Form A stated:

> We, the jury, unanimously find in favor of the Defendant, Adrian Santos, and against the Plaintiff, Randall Artis.

Verdict Form B laid out the elements of the First Amendment claim separately and asked the jury to find whether Artis had proved each by a preponderance of the evidence. It then instructed the jury to either (1) fill out Form A if it found

that Artis had not proved every element of his claim, or (2) determine the amount of damages if it had. Each form provided for the foreperson's signature and date.

We reject Artis's argument that Form B was legally inaccurate or confusing for the same reasons we rejected his challenge to the court's jury instructions. Form B simply turned each of the elements of the claim into a yes or no question. As we have discussed, those elements accurately reflect First Amendment retaliation law.

Artis's assertion that Form B prejudiced him is more puzzling. He asserts that Form B was prejudicial because it was "dispositive" in that "if any juror voted 'no' to paragraph 3 or if one of the eight jurors voted yes to all but one of the paragraphs," then Artis would lose. Artis seems to think that Form B was defective because it required the jury to find that he had proved every element of his claim before rendering a verdict for him. But that is exactly what he must do to win. *See, e.g.*, *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019) (the plaintiff must establish each element of his First Amendment retaliation claim).

Artis's remaining arguments are equally unavailing. Federal Rule of Civil Procedure 49 commits the decision whether to use a general or special verdict form to the discretion of the district court. *See* Fed. R. Civ. P. 49; *Hibma v. Odegaard*, 769 F.2d 1147, 1157 (7th Cir. 1985). It does not impose a complexity threshold before endowing a court with that discretion.

Neither does Rule 49 require the district court to explain its choice to issue one formulation of a verdict form over another. The case Artis cites for his contrary proposition has nothing to do with verdict forms. *See United States ex rel.*

*Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022). *Nicholson* was about the district court's failure to explain its decision to grant leave to amend a pleading under Federal Rule of Civil Procedure 15(a)(2). The Fourth Circuit held that in the context of Rule 15, "it would be an abuse of discretion for the district court to fail to identify which of the three permissible reasons to deny amendment it relied on or to fail to give any reasons at all." *Id*. Requiring the court to explain its denial of leave to amend makes sense given the Fourth Circuit's limitations on such a denial to just three situations (prejudice, bad faith, or futility). *Id.* A district court's choice of verdict form under Rule 49, in contrast, is not so limited—"[o]ur case law requires only that the verdict form not be confusing or misleading to the jury." *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012). A court's explanation of its decision would therefore add little to our review. Rule 49 does not require it.

### D. The Jury's Verdict

Artis last questions the consistency of the jury's verdict. When the jury returned its verdict in favor of Santos, it filled out only verdict Form A, leaving Form B blank. Artis asserts that the jury's failure to fill out Form B warrants a new trial. According to Artis, an incomplete Form B deprives the verdict of "any indicia of trustworthiness [] as to how jurors voted."

There are two problems with this argument. The first is that Artis did not make it before the district court, so he has waived it. The time to challenge inconsistencies between the jury's answers to interrogatories and its general verdict is before the jury disbands. *See Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 754 (7th Cir. 2020); *Cundiff v. Washburn*, 393 F.2d 505, 507 (7th Cir. 1968).

The second is that the verdict the jury returned was clear. The district court instructed the jury to "fill in, date, and sign the *appropriate* form." Form A applied if the jury found for Santos; Form B laid out the elements of Artis's claim. The jury completed Form A, which leaves no question that the jury unequivocally intended to render a defense verdict: "We, the jury, unanimously find in favor of the Defendant, Adrian Santos, and against the Plaintiff, Randall Artis." That the jury left Form B blank does nothing to undermine our faith in that verdict.

### III. Conclusion

The judgment of the district court is

AFFIRMED.