**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1507**

---

UNITED STATES OF AMERICA EX REL. LIESA KYER,

Plaintiff – Appellant

v.

THOMAS HEALTH SYSTEM, INC., a/k/a West Virginia United Health System; HERBERT J. THOMAS MEMORIAL HOSPITAL ASSOCIATION, d/b/a Herbert J. Thomas Memorial Hospital; CHARLESTON HOSPITAL, INC., d/b/a St. Francis Hospital; THS PHYSICIAN PARTNERS, INC.; BRIAN ULERY,

Defendants – Appellees.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Joseph R. Goodwin, District Judge.  (2:20-cv-00732)

---

Argued:  January 27, 2026                    Decided:  June 4, 2026

---

Before GREGORY, RICHARDSON, and RUSHING, Circuit Judges

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judges Gregory and Rushing joined.

---

**ARGUED:**  Chandra Napora, MORGAN VERKAMP, LLC, Cincinnati, Ohio, for Appellant.  David B. Honig, HALL RENDER KILLIAN HEATH & LYMAN, P.C., Indianapolis, Indiana, for Appellees.  **ON BRIEF:**  Jennifer M. Verkamp, Nathaniel F. Smith, MORGAN VERKAMP, LLC, Cincinnati, Ohio, for Appellant.  Matthew M. Schappa, Kennedy M. Bunch, HALL RENDER KILLIAN HEATH & LYMAN, P.C.,

Indianapolis, Indiana; Robert L. Massie, NELSON MULLINS RILEY & SCARBOROUGH LLP, Huntington, West Virginia, for Appellees.

RICHARDSON, Circuit Judge:

This appeal involves a dizzying kaleidoscope: five defendants, three statutes, and one complex industry.

Liesa Kyer, a former nurse at Thomas Memorial Hospital, brought this *qui tam* action on behalf of the United States under the False Claims Act. She alleges that between 2013 and 2022, five defendants—Thomas Memorial Hospital; three other entities in the corporate family, St. Francis Hospital, THS Physician Partners, Inc., and Thomas Health System, Inc.; and former executive Brian Ulery—violated the False Claims Act by submitting claims barred by the Stark Law and the Anti-Kickback Statute.

If there were a plausible picture of fraud, you'd think it would be apparent from the plaintiff's 83-page complaint and 33-page appendix. But it is not. The amended complaint repeatedly accuses Defendants of nefarious schemes and sinister dealings that, when stripped of inflammatory rhetoric and conclusory labels, are consistent with running a lawful healthcare business. We affirm the district court's dismissal of the complaint and denial of post-judgment leave to amend.

## I.     BACKGROUND

We first map the entities and relationships that form the Thomas Health System structure. We then turn to the activities that Kyer claims added up to fraud, as alleged in the complaint and its attachments. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

3

### A.    Thomas Health System Entities And Operations

Thomas Health System, Inc. is a nonprofit corporation based in South Charleston, West Virginia. It owns and operates the defendant hospitals, Thomas Memorial Hospital and St. Francis Hospital. It also owns and controls THS Physician Partners, Inc. (THSPP), a multi-specialty physician group. With the exception of St. Francis Hospital, these entities share a corporate address. And during the relevant time period, all the entities shared the same leadership, including the individual defendant, Brian Ulery, who was the entities' chief operating officer.[1]

As the corporate parent, Thomas Health oversees the day-to-day operations of its subsidiaries. It handles most administrative and financial tasks, including administering payroll, keeping records, and issuing tax forms.

The physician group, THSPP, employs physicians and nonphysician providers. Nonphysician providers are healthcare workers with some advanced training and the ability to diagnose and treat patients, such as physician assistants and nurse practitioners. *See* 42 C.F.R. §§ 410.74, 410.75; Taylor Pankau, *The Growing Use of Mid-Level Practitioners in the Delivery of Health Care*, 22 DePaul J. Health Care L. 129 (2021). In West Virginia, they generally must practice under the supervision of a physician. *See* W. Va. Code § 30-3E-9.

The defendant hospitals participate in various federally funded healthcare programs, including Medicare, and "receive a sizeable portion of their revenue from the United States

---

[1] Ulery left Thomas Health around May 2022.

government." J.A. 74. The hospitals submit different Medicare claims depending on the service rendered. To be eligible for Medicare payments, hospitals must certify compliance with various federal healthcare laws—such as the Stark Law and Anti-Kickback Statute—upon enrollment in Medicare and in annual reports. *See* 42 C.F.R. § 424.510.

The amount a healthcare provider can be paid under Medicare for a given procedure depends on that procedure's "relative value units," a standardized measure of the resources required to perform it. *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1314–15 (11th Cir. 2024). Each service's relative value has three components: work, practice expense, and malpractice insurance. 42 C.F.R. § 414.22; 90 Fed. Reg. 49,266, 49,267 (Nov. 5, 2025). The work component of the relative value unit (wRVU) reflects the time, skill, and effort required to perform a given procedure. On this component, the complexity of the procedure matters—a shorter, more complex procedure may be assigned more wRVUs than a longer, straightforward one. The practice-expense component accounts for the overhead or equipment expenses involved. *Id.* at 49,331–32, 49,336. And the malpractice-insurance component incorporates the relative risk of services and the cost to insure them.

The Centers for Medicare and Medicaid Services assigns precise values to these components for each procedure and periodically updates them through rulemaking. It also sets the conversion factor, or reimbursement rate, per relative value unit. *See generally id.* Finally, the resulting reimbursement amount is further adjusted based on a geographic practice cost index.

wRVUs measure physician productivity. THSPP, like many healthcare employers, compensates physicians based on their wRVU totals. THSPP requires its physicians to

5

generate a minimum number of wRVUs to earn their base salary, and pays a bonus that scales with the number of wRVUs that exceed the minimum target. The target, base salaries, and bonuses differ across the physicians.[2] Some physicians also receive credit for a portion of the wRVUs generated by nonphysician practitioners under their supervision. Some physicians are highly paid, with a handful earning more than 90% of physicians surveyed by a medical association.

In early 2015, the hospitals transitioned to a "provider-based billing" structure, which let the entities capture more revenue from a federal drug-discount program. As part of this change, some physician offices, which are not physically within the hospitals, "be[came] departments of the hospital." J.A. 118. The hospitals thereby qualified for significant savings on drugs prescribed by physicians at those offices.

This change also affects how Medicare pays for services provided by physicians at those locations. Before the change, when a patient saw a physician in a non-hospital office, all professional services and overhead expenses were bundled into a single bill. Now that those offices are hospital outpatient clinics, each visit can be split into two bills: The physician group bills for physicians' "professional" services, while the hospital submits a separate claim for the "facility" overhead component. Compared to the bundled bill, this billing structure reduces the fees paid to the *physician group*, which collects only the "professional" services component. The *hospital* captures the overhead in the form of

---

[2] For example, one family-medicine physician received a base salary of $110,000 if he hit an annual wRVU target of 2,475, and a bonus of $35 per additional wRVU. Another physician had a base salary of $384,000 and was eligible for a $59 per wRVU bonus for each wRVU above 6,508.

facility fees, whether the service was performed at a legacy hospital or an office that is now considered a department of the hospital. These facility fees tend to be higher, as Medicare seems to set reimbursement rates above physician-office rates to account for the elevated costs of operating a hospital.[3] As a result of all this, physician groups operating under this structure typically show a loss on the books. Indeed, THSPP itself consistently shows operating losses. In total, however, Medicare "generally pays more for the same or similar services" in hospital outpatient departments than in physicians' offices. Medicare Payment Advisory Comm'n, *Report to Congress: Medicare Payment Policy* 111 (Mar. 2019); 81 Fed. Reg. 79,562, 79,705 (Nov. 14, 2016). So the switch to provider-based billing allows an integrated health system like Thomas Health to capture more revenue across its entities. But those revenues are unequally distributed. To make up for the physician practice's reduced revenues, the parent company backfills the practice (here, THSPP) through transfers.

Kyer, a former nurse at Thomas Memorial Hospital, began hearing rumors of wrongdoing after Ulery joined Thomas Health's leadership. She was concerned about statements he made about buying up private practices in the area, and about his experience leading a hospital system that was investigated by the United States for False Claims Act violations. After her husband, a physician, declined an offer to join THSPP, Kyer spoke

---

[3] *See* 78 Fed. Reg. 43,282, 43,296 (July 19, 2013); Linda J. Blumberg & Christine H. Monahan, *Facility Fees 101: What is all the Fuss About?*, Georgetown Univ. Ctr. Health Ins. Reforms (Nov. 2, 2023).

7

with various local physicians about their experiences with Thomas Health entities. Her suspicions grew.

## B.    Procedural History

Kyer filed this *qui tam* action under seal in November 2020, alleging that at Ulery's direction, Thomas Health, through its subsidiaries, presented false claims to the federal government. She claims that Defendants violated both the Stark Law and the Anti-Kickback Statute, which broadly regulate financial incentives to increase medical referrals at the government's expense; by certifying compliance with those laws in federal claims, Defendants also violated the False Claims Act. Kyer asserts four causes of action, alleging that Defendants (1) presented false claims,[4] (2) made false statements material to false claims,[5] (3) conspired to violate the False Claims Act,[6] and (4) concealed or avoided an obligation to pay the government.[7]

---

[4] "[A]ny person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable . . . ." 31 U.S.C. § 3729(a)(1)(A).

[5] "[A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable . . . ." *Id.* § 3729(a)(1)(B).

[6] "[A]ny person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . is liable . . . ." *Id.* § 3729(a)(1)(C).

[7] "[A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable . . . ." *Id.* § 3729(a)(1)(G).

8

The complaint remained sealed for 60 days, as the False Claims Act requires. 31 U.S.C. § 3730(b)(2). At the government's request, the district court extended the seal *five* times before the government finally declined to intervene almost three years after the complaint was filed.[8]

Kyer then filed an amended complaint in March 2024. The district court dismissed it for failing to plead fraud with the particularity that Rule 9(b) requires. Kyer moved to vacate the judgment under Rules 59(e) and 60(b)(6) and for leave to amend under Rule 15(a), which the district court denied. Kyer timely appealed both the dismissal and the denial of vacatur.[9] This Court has jurisdiction over both orders under 28 U.S.C. § 1291 and reviews them as "a single judgment." *Daulatzai v. Maryland*, 97 F.4th 166, 178 (4th Cir. 2024).

## II.    THE DISTRICT COURT PROPERLY DISMISSED THE COMPLAINT

We review a Rule 12(b)(6) dismissal *de novo*. *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013). Ordinarily, a complaint need only include "a short and plain statement of the claim showing that the pleader is

---

[8] Although each seal extension that delayed the case required the Government to show "good cause," the appellate record does not adequately explain what could have justified this almost three-year delay. 31 U.S.C. § 3730(b)(3); *cf. Am. C.L. Union v. Holder*, 673 F.3d 245, 257 (4th Cir. 2011).

[9] Because Kyer filed motions under Rule 59(e) and 60(b) within 28 days of the district court's order dismissing the complaint, the appeal clock did not start running until the district court entered the order disposing of the post-judgment motions, on April 11, 2025. Fed. R. App. P. 4(a)(4)(A)(iv), (vi); Fed. R. Civ. P. 59(e); *Banister v. Davis*, 590 U.S. 504, 508–09 (2020). Kyer noticed her appeal of both orders on May 5, 2025, within the 30-day deadline.

entitled to relief." Fed. R. Civ. P. 8(a)(2). And the plaintiff must allege enough facts that, when accepted as true, with all reasonable inferences drawn for the plaintiff, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facts "merely consistent with" liability do not clear the plausibility hurdle, and we do not accept "legal conclusions couched as facts or unwarranted inferences." *Nathan*, 707 F.3d at 455 (internal quotation marks and citations omitted).

Because Kyer asserts a fraud claim under the False Claims Act, she must clear a higher hurdle than the one Rule 8 sets: She must "state with *particularity* the circumstances constituting fraud." Fed. R. Civ. P. 9(b) (emphasis added). Consistent with the common law, the Federal Rules demand greater detail when alleging fraud. *See* Charles E. Clark, *Handbook of the Law of Code Pleadings*, § 48, at 312 (2d ed. 1947). The court must be satisfied that the complaint gives notice to the defendants "of the particular circumstances for which [they] will have to prepare a defense at trial," and that "plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784, 789 (4th Cir. 1999). Failure to comply with the particularity standard is a failure to state a claim under Rule 12(b)(6).

### A.   The Complaint Does Not Plead With Particularity That Claims Presented To The Government Were False

A False Claims Act claim has four elements: (1) "a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *Harrison*,

10

176 F.3d at 788; *see also United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 193 (4th Cir. 2022).

Because False Claims Act claims "must be linked in some way to presenting a claim for payment to the government," the relator must plead this "presentment" element with particularity. *Nicholson*, 42 F.4th at 194; *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018). Kyer must do more than merely describe a scheme and allege, without factual detail, that claims requesting illegal payments "must have been" or "were likely to have been" or "should have been submitted to the Government." *Nathan*, 707 F.3d at 457 (citation omitted). Rather, she must allege either (1) the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," or (2) a "pattern of conduct that would *necessarily* have led to submission of false claims." *Nicholson*, 42 F.4th at 194 (quoting *Grant*, 912 F.3d at 197); *see also Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 491 (4th Cir. 2025).

In support of the first theory, Kyer points to roughly 30 pages of tables attached to the complaint as appendices. Though the tables teem with technical abbreviations and carry no explanation, we read them to list claims submitted by THSPP and paid by the federal government. *See, e.g.*, J.A. 144.

| Key for De-identified Claims | BPx-Billing Prov NPICS Name Single Derived2 | RFx-Referring Prov NPICS Name Single Derived | RPx-Rendering Prov NPICS Name Single Derived | CL-Place of Svc Physn Org Name | CL-Date From | CL-Procedure Cd | CL-Procedure Modifier Cd 1 | CLF-Amt Paid To Prov | CHD-Claim Submission Date | CHD-Claim Paid Date |
|---|---|---|---|---|---|---|---|---|---|---|
| MH | THSPP | CHAPMAN, WILLIAM | MANI, JOHN | THS PHYSICIAN PARTNERS | 07/13/2016 | 52000 | ~ | $ 98.58 | 07/19/2016 | 08/02/2016 |
| MH | THSPP | CHAPMAN, WILLIAM | MANI, JOHN | THS PHYSICIAN PARTNERS | 07/13/2016 | 99205 | 25 | $ 130.16 | 07/19/2016 | 08/02/2016 |

Each row corresponds to a billed procedure, identified by a five-digit code. The columns appear to list the "referring" provider and "rendering" provider, where the

11

procedure took place, and the dates on which the procedure was performed, the claim was submitted, and the claim was paid. The tables only list THSPP as the billing provider. For many claims, the tables list a defendant hospital as the place of service. That is, Kyer has shown that THSPP submitted a claim to the federal government for a service that occurred at a Thomas Health hospital. And the tables specify when the claim was submitted, and when it was paid. The screenshot, for example, shows that Dr. Chapman referred a patient to Dr. Mani for a cystourethroscopy performed at the physician office and billed by THSPP. So we can figure out the who, the what, the where, and the when. *See Wheeler*, 127 F.4th at 493–95. But we're missing "how"—indeed, *whether*—any claim was fraudulent.[10]

Similarly, Kyer notes that the defendant hospitals submit annual cost reports that certify "that the services identified in this cost report were provided in compliance with" both the Stark Law and the Anti-Kickback Statute. J.A. 78. The complaint adequately alleges that the hospitals submitted these reports with the certification. Whether these cost reports are fraudulent claims, then, turns on whether the hospitals made these certifications while knowing that they did not comply with either the Stark Law or the Anti-Kickback Statute.

---

[10] Even if a bill was for services that violated the Stark Law, it's not clear that the bill becomes false just by virtue of being submitted. Whether THSPP or the hospitals were legally allowed to submit the form does not tell us whether the submission is of a *misrepresentation*. The complaint notes that these claims are submitted on specific forms, but does not allege any certification requirement for each bill.

As explained, the face of the submitted-claims tables and certification do not establish how or whether the claims were fraudulent. So the complaint must either allege *how* the claims in the appendices or cost reports were fraudulent, or show that the defendants' pattern of conduct—that is, the alleged prohibited kickback or Stark Law violation—necessarily resulted in the submission of false claims. When the fraud claim "hinges on an underlying" Stark Law or Anti-Kickback Statute violation, those "scheme[s] must be pleaded with particularity as well." *Nicholson*, 42 F.4th at 194–95. So we must determine whether the complaint alleges a violation of either the Stark Law or the Anti-Kickback Statute, and whether it ties any such violation to False Claims Act liability.

### 1.    The complaint does not plead a Stark Law violation

The Stark Law limits efforts by healthcare providers to profit from the overutilization of medical services paid for by Medicare.[11]  *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012) (*Tuomey I*). It prohibits any physician who has a "financial relationship" with a hospital (or other entity) from making a "referral" to that hospital for the furnishing of "designated health services" paid by Medicare. 42 U.S.C. § 1395nn(a)(1). If the physician makes a prohibited referral, the hospital may not bill Medicare for those referred services. *Id.*

These terms are broad but not boundless. To start, a "referral" is one physician's request for the hospital to provide care, including tests, procedures, or physician visits. *Id.* § 1395nn(h)(5); 42 C.F.R. § 411.351. But it does not include services the referring

---

[11] It also indirectly reaches medical expenses paid for by Medicaid.  § 1396b(s).

13

physician "personally perform[s] or provide[s]."   42 C.F.R. § 411.351; 42 U.S.C. § 1395nn(h)(5)(A).

To qualify, the care must be covered by Medicare and fall within one of twelve "designated health services."  Such services run the gamut from inpatient and outpatient hospital services to clinical laboratory services and outpatient prescription drugs.  42 U.S.C. § 1395nn(h)(6)(A)–(L).  Their precise scope warrants two additional points.  First, the "[i]npatient and outpatient hospital services" category excludes "professional services performed" by physicians *and nonphysicians*.  42 C.F.R. § 411.351.  Second, designated health services include the use of hospital facilities themselves.  *Id.* § 409.10(a); *see* 66 Fed. Reg. 856, 941 (Jan. 4, 2001) ("[I]n the case of an inpatient surgery, there would be a referral of the technical component of the surgical service, even though the referring physician personally performs the service.  If the referring physician has a financial relationship with the hospital, that relationship must fit in an exception."); *Tuomey I*, 675 F.3d at 407.

A "referral" to a hospital for "designated health services" is prohibited only if the referring physician has a specified "financial relationship" with the hospital—either "an ownership or investment interest" in the hospital or a "compensation arrangement" with it. 42 U.S.C. § 1395nn(a)(2).  A compensation arrangement may be direct, where remuneration passes between the physician and the hospital without any intervening entity, or indirect, through a chain of intermediate financial relationships.  42 C.F.R. § 411.354(c)(1)–(2).  Not all ownership or compensation qualifies, § 1395nn(b)–(e), and

14

regulations flesh out the scope of a qualifying relationship.  *See generally* 42 C.F.R. § 411.354.[12]

To plead a Stark Law violation, then, Kyer must plausibly allege that (1) a physician (2) with a prohibited financial relationship with the hospitals (3) made a referral (4) for a designated health service, and (5) that a hospital then submitted a claim to Medicare for that service.  The complaint may well plausibly allege elements (3) through (5).  The rub is the financial-relationship element, which on Kyer's complaint reduces to whether the referring physicians' compensation varied with—or took into account—the volume or value of their referrals to the hospitals.  We hold that the complaint has not sufficiently alleged this element.

### a.   The complaint might plausibly allege facility use referrals paid by Medicare

To assess whether compensation varied with referrals, we must identify what referrals Kyer alleges.  The complaint and accompanying tables show that THSPP billed Medicare for professional services rendered by its physicians at a Thomas Health hospital.  They also show that some of those services followed from another physician's referral.  But the allegations leave a gap:  Where a physician made a referral, was it for a designated health service?  The most promising designated-health-service category, "inpatient and outpatient hospital services," is insufficient, because the regulations expressly exclude

---

[12] Although *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), eliminated *Chevron* deference to agency interpretations of ambiguous statutes, neither party challenges these Stark Law regulations.  So we need not determine what deference these regulations command.  *See id.* at 394–96; 42 U.S.C. §§ 1395nn(b)(4), (h)(4), (h)(7).

"professional services performed by physicians" and nonphysician providers from that category.  42 C.F.R. § 411.351.  And though each entry provides a numeric code identifying the procedure, the complaint does not identify which—if any—correspond to designated health services under the Stark Law.[13]  Kyer dumps thousands of procedure codes and asks the court to sort through them.[14]  We cannot reasonably infer from these facts that THSPP submitted claims for designated health services.

Rather, the tables might indirectly reveal a facility-use-as-referral theory.  Though the complaint does not explicitly connect the tables and the provider-based billing structure, together they might permit the inference that physicians made requests for use of the hospital's facilities, for which the hospitals billed Medicare.  This may seem odd when the tables only show that *THSPP* submitted claims.  But those claims seem to include some services provided at the defendant hospitals (or an office that is treated as a hospital department).  Because provider-based billing unbundles professional and facility claims as described above, a visit to one of the hospitals could generate Medicare claims from both THSPP and the hospital.  So we might infer that the hospitals also submitted corresponding

---

[13] For example, we cross-referenced the codes in the first ten rows against the Medicare Code List for the applicable year, and could not easily identify a match.  The Code List "identifies all the items and services included within certain designated health services (DHS) categories."  *See* Ctrs. Medicare & Medicaid Servs., *List of CPT/HCPCS Codes* (2026).

[14] Kyer claims that these codes need no further explanation because "Defendants know precisely what those [codes] mean."  Opening Br. at 29 n.1.  While one purpose of Rule 9(b) is to provide notice to the defendant, its other purposes inherently implicate the court's gatekeeping function.  *See Nicholson*, 42 F.4th at 195.  The court must be able to evaluate the complaint to fulfill that function.  And so the complaint must adequately connect the dots between these codes and the alleged fraud.

16

claims for the associated facility use.  *See Nathan*, 707 F.3d at 457.  And these claims are referrals even when the referring and rendering THSPP physicians are the same.  *Tuomey I*, 675 F.3d at 407; *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 170 (3d Cir. 2019).  So the complaint might plausibly allege that the defendant hospitals submitted Medicare claims for designated health services provided based on referrals from THSPP physicians.

But that is not enough to violate the Stark Law—such a violation requires that the services were provided pursuant to a *prohibited* referral.  Physicians are *prohibited* from making such referrals only when they have a specified "financial relationship" with the hospitals.  Whether Kyer has pleaded a Stark Law violation thus turns on whether the referring THSPP physicians had a prohibited "financial relationship" with the hospitals.

> **b.**      **The complaint does not plausibly allege a prohibited "financial relationship"**

The Stark Law is implicated when the referring physician has one of two kinds of a financial relationship with the hospital:  an "ownership or investment interest" or a "compensation arrangement."  42 U.S.C. § 1395nn(a)(2).  The complaint alleges only the second type, which includes both direct and indirect arrangements.  *Id.* § 1395nn(h)(1)(B).  Here, we ask whether the hospitals had an indirect compensation arrangement with the referring physicians, which would make the referrals prohibited.[15]

---

[15] The complaint also alleges that there was a direct compensation arrangement between the physicians and the hospitals.  It claims that THSPP and the defendant hospitals, "while separate corporate entities on paper," nevertheless "were functionally the same entity."  J.A. 85.  In support of this claim, the complaint states that the entities shared common leadership, a common address, and even a common bankruptcy case.  Moreover,

For most of the relevant time period, regulations stated that an indirect compensation arrangement exists if (1) there is an "unbroken chain of . . . entities that have financial relationships" between the referring physician and the hospital; (2) the referring physician "receives aggregate compensation . . . that varies with, or takes into account, the volume or value of referrals" that physician generates for the hospital; and (3) the hospital has "actual knowledge of, or acts in reckless disregard or deliberate ignorance of" the fact that the referring physician's compensation so varies.[16]  42 C.F.R. § 411.354(c)(2)(i)–(iii) (2020); 42 U.S.C. § 1395nn(h)(1).

The complaint plausibly alleges the first and third prongs.  It alleges that the physicians are employed by THSPP and that Thomas Health owns THSPP and the defendant hospitals.  So an unbroken chain of financial interests ties the referring

---

the hospitals made annual "equity transfers" to THSPP.  These actions supposedly rendered "any corporate distinctions . . . legal fiction," as "THSPP takes no action independent of" the other entities.  J.A. 90.

But the complaint does not plausibly allege a direct compensation arrangement. Certainly, these entities are closely related.  But the Stark Law's financial relationship framework does not turn on whether entities within a corporate family function together. The Stark Law regulations clarify that a "direct compensation arrangement" exists only if "remuneration passes between the referring physician . . . and the [hospital] without any intervening . . . entities."  42 C.F.R. § 411.354(c)(1)(i).  The complaint recognizes that THSPP, not the hospitals, directly employed and compensated the referring physicians. That Thomas Health "subsidized THSPP" to compensate the physicians only undercuts any inference of a direct financial relationship between the physicians and the hospitals. J.A. 87.  Necessarily, THSPP stood between the physicians and the hospitals.

[16] Effective January 21, 2021, plaintiffs must also plead that the "amount of compensation . . . per individual unit . . . [i]s not fair market value for items or services actually provided."  42 C.F.R. § 411.354(c)(2)(ii)(A)(2).

18

physicians to the hospitals.[17]  The complaint also plausibly alleges that the hospitals had actual knowledge of the physicians' compensation structure.[18]

So the dispositive question is whether the complaint raises a reasonable inference that the referring physicians' compensation varied with, or took into account, the volume or value of their referrals to the hospitals.

To start, the complaint does not allege what particular designated health services were referred.  But, as discussed above, we might infer that each service that a THSPP physician provided at a defendant hospital was a referral for the use of the hospital facility.  If so, then we would need to ask whether the referring physicians' compensation varied with, or took into account, the volume or value of their referrals.

Kyer's basic theory is that the physicians' wRVU-based compensation was a "proxy for hospital referrals, since the THSPP physicians received wRVU credit every time they performed a service or procedure at the" hospitals.  J.A. 93.  But wRVU credit is awarded for the work the physicians *personally performed*.  And the statute and regulations make clear that any services that the referring physicians "personally perform[s]" are not

---

[17] Though the ownership interests run in different directions economically—Thomas Health owns both THSPP and the hospitals—the distinction is not statutorily relevant.  *See* § 411.354(c)(2)(i); *see also* Modernizing and Clarifying the Physician Self-Referral Regulations Final Rule, 85 Fed. Reg. 77,492, 77,526 (Dec. 2, 2020) (describing an indirect compensation arrangement for the following chain: "[h]ospital—(owned by)—parent organization—(owns)—physician practice—(employs)—physician").

[18] The complaint alleges knowledge based on the use of wRVU-based bonuses.  Kyer also quotes Ulery as stating that if Thomas Health "owned [the private practices in the area]," it would also "own their referrals."  J.A. 121.  While these particular allegations are of dubious helpfulness to the knowledge element, we may assume the hospitals' knowledge.

19

"referrals" at all. 42 U.S.C. § 1395nn(h)(5)(A); 42 C.F.R. § 411.351. Compensation tied to the volume of a physician's own work, therefore, is not compensation that takes into account the volume of *referrals*.

Even so, Kyer seeks to analogize compensation for work physicians performed to the pay structure we held unlawful in *Tuomey II*. *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015). In *Tuomey II*, we upheld a finding that a compensation formula based on "collections" for personally performed services created an indirect compensation arrangement: "[T]he more procedures the physicians performed at the hospital, the more facility fees [the hospital] collected, and the more compensation the physicians received." *Id.* at 379. That formula tied physician pay directly to the hospital's referral revenue, because the relevant collections pool included the facility fees generated by the same procedures.[19] *Id*.

The wRVUs alleged here operate differently. A wRVU measures the time, skill, and effort required to perform a procedure. 42 C.F.R. § 414.22; 90 Fed. Reg. 49,266, 49,267 (Nov. 5, 2025). Thus, the formula tracks only the physician's work, which is what the statute excludes from its definition of "referrals." Read as Kyer suggests, *Tuomey II* would prove too much: Any compensation structure that deviated from a flat salary would

---

[19] The Court there also cited a statement that "every time [a] physician . . . did a legitimate procedure on a Medicare patient at the hospital pursuant to [the agreement], the doctor got more money . . . and the hospital also got more money." *Tuomey II*, 792 F.3d at 379. The structure that gave rise to that effect—collections-based compensation that necessarily included facility-fee revenue—is absent in Kyer's allegations.

establish a *prima facie* Stark Law violation, even if the physician's productivity is what determines their compensation and no hospital revenue figures in the formula.

And this reading cannot be right, because the statutes and regulations provide that compensation does not violate the Stark Law just because it varies with, or takes into account, the work that the physicians perform. *See* 42 U.S.C. § 1395nn(h)(5)(A) (excluding work the physician personally performs); Modernizing and Clarifying the Physician Self-Referral Regulations Final Rule, 85 Fed. Reg. 77,492 (Dec. 2, 2020). Rather, compensation must vary based on the volume or value of hospital referrals—not the physician's own labor. And compensation "takes into account" the volume or value of referrals only if "the formula used to calculate the physician's . . . compensation includes the physician's referrals to the entity as a variable," producing compensation that "positively correlates with the number or value of the physician's referrals." 42 C.F.R. § 411.354(d)(5). A wRVU formula based on personally performed work does not include referrals as an input; the mere correlation that Kyer identifies—that more work performed at the hospitals means more wRVUs—is not enough.

Kyer responds that some physicians' compensation rewarded not only their own labor but also supervision of nonphysicians.[20] But supervising or collaborating with a

---

[20] Nonphysician practitioners include nurse practitioners and physician assistants. As Kyer's complaint notes, THSPP used the terms "collaborating" and "supervising" to describe physicians receiving credit for nonphysicians' wRVUs. J.A. 102. The physicians do not appear to have been compensated for supervision in the same way. For example, some physicians earned stipends of $5,000 or $10,000 to supervise nonphysicians. It is not clear how that fixed rate varied with, or took into account, the volume or value of facility referrals. Other doctors were part of a different group-based arrangement. And yet others,

21

nonphysician is itself work that the physician performs. *See, e.g.*, W. Va. Code § 30-3E-9(a) ("A physician assistant *may not practice independent of a collaborating physician*.") (emphasis added); § 30-3E-11(b) ("When collaborating with physician assistants, collaborating physicians *shall observe, direct, and evaluate* the physician assistant's work, records, and practices as necessary for appropriate and meaningful collaboration.") (emphasis added); *see also* § 30-7-15b(c); § 30-7-1. So compensation that credits a physician for supervising a nonphysician rewards the physician's work, not the volume or value of any physician's referrals.

So Kyer pivots and claims that considering supervised nonphysicians' wRVUs serves as an indirect "proxy" for the value or volume of referrals. J.A. 100. But Kyer fails to allege *how* the nonphysicians' wRVUs could plausibly serve as such a proxy. That is, Kyer does not explain how the nonphysicians' wRVUs correspond to referral volume or value, rather than to practice volume, performed under the physician's supervision—a responsibility imposed by West Virginia law. Nor does she link the nonphysicians' wRVUs to facility referrals. A conclusory correlation does not plausibly plead with particularity that the physicians' compensation varied with, or took into account, the volume or value of referrals. Inferring that nonphysicians' wRVUs are somehow a proxy for referral volume requires taking unwarranted logical leaps.

Kyer raises four other allegations: (1) Thomas Health tracked each physician's contribution to the hospital, including revenues based on actual and projected referrals;

---

it appears, received credit for the work of nonphysicians they supervised or collaborated with. J.A. 101–02 (discussing collaboration and supervision credits).

22

(2) THSPP incurred "unreasonable losses" from compensating physicians, which had to be offset by cash transfers from the hospitals, J.A. 96; (3) compensation for many physicians was near, at, or above the 90th percentile of benchmark data; and (4) Ulery, who had led a different hospital that settled a False Claims Act suit, had made suggestive statements that buying up physician practices would allow Thomas Health to "own their referrals." J.A. 94, 101. None of these allegations, alone or together, plausibly establishes that the physicians' compensation varied with or took into account the volume or value of referrals.

*Tracking* referral volume and value is not the same as *compensating* physicians for their referrals. The complaint says nothing about whether cash transfers from the hospitals to THSPP rose or fell with the volume or value of referrals. And pay at the 90th percentile is not, by itself, evidence of variation with referrals. Indeed, by definition, ten percent of physicians make more than the 90th percentile. *Cf. Bookwalter*, 946 F.3d at 172–74 (finding a plausible inference of an indirect compensation arrangement where compensation and work units were *multiples* of the 90th percentile and year-over-year double-digit growth). Kyer alleges 90th-percentile compensation for a handful of physicians, and only intermittently at that. That allegation falls well short of the complaint in *Bookwalter*, and more importantly, does not explain how any physician's pay rose with the volume or value of referrals; it shows only that the level of compensation was sometimes high. Finally, a hospital system may want to "own" physician referrals and still structure Stark Law–compliant compensation arrangements.

Perhaps what Kyer means to suggest is that each allegation is smoke; combined, there must be fire *somewhere*. Sometimes that is so. But that is not how the law works.

23

The complaint must identify the fire.  Without a plausible allegation that the physician compensation varied with, or took into account, the volume or value of referrals to the hospital for designated health services, the complaint does not plead with particularity a Stark Law violation.

### 2.      The complaint does not plead an Anti-Kickback Statute violation

With no Stark Law violation, we turn to the Anti-Kickback Statute.  The Anti-Kickback Statute prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration" to "induce" a person to make a referral for "any item or service" paid for by a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(2).  The bar for inducement is not high:  The statute is violated even if only one purpose of the remuneration was to induce referrals.  *United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021).  And a claim that includes items or services "resulting from" a prohibited kickback "automatically constitutes a false claim under the False Claims Act."  *Nicholson*, 42 F.4th at 194 (citation omitted); 42 U.S.C. § 1320a-7b(g).[21]

Thus, to plead an Anti-Kickback Statute violation, Kyer must plausibly allege that (1) there was remuneration (2) offered or paid by the defendants, (3) with the requisite

---

[21] Whether 42 U.S.C. § 1320a-7b(g)'s "resulting from" language requires but-for causation between the kickback and the resulting claim has divided our sister circuits. *Compare United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 836 (8th Cir. 2022), *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–53 (6th Cir. 2023), and *United States v. Regeneron Pharmaceuticals, Inc.*, 128 F.4th 324, 334 (1st Cir. 2025) (each requiring but-for causation), *with United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 98 (3d Cir. 2018) (requiring only a "link").  Because the complaint does not plausibly allege an Anti-Kickback Statute violation in the first place, we have no occasion to address the causation standard.

knowing-and-willful intent that at least one purpose of the remuneration was to induce referrals (4) for items or services payable under a federal healthcare program. Kyer presses two theories of liability, neither of which survives Rule 9(b).

Kyer first alleges that the hospitals paid kickbacks to THSPP by covering THSPP's annual operating deficit through cash transfers. True, the hospitals did cover that deficit. But the complaint's allegation that these payments induced referrals is conclusory. The subsidies are at least as consistent with lawful explanations, such as maintaining essential but unprofitable service lines, or allocating expenses across related entities. The complaint itself supplies a lawful explanation: that the transfers reflect the accounting consequence of the health entities' move to provider-based billing. Where a complaint pleads facts that are equally consistent with lawful and unlawful conduct, it has not crossed the plausibility threshold. *See Iqbal*, 556 U.S. at 678. Kyer's allegations that these transfers were inducements rather than accounting reconciliations are precisely the sort of conclusory labels that we cannot credit under Rule 9(b). *See Nathan*, 707 F.3d at 455.

Kyer's second theory is that the hospitals indirectly paid kickbacks to THSPP physicians. This theory has two strands. In the first, she claims that financial transfers from the hospitals to THSPP "enabled" THSPP to "inflate" its physicians' pay, and the above-market portion of their compensation should be considered remuneration to induce referrals to the hospital. In support, she points to a handful of physicians who were intermittently paid near, at, or above the 90th percentile of physicians in similar specialties. She claims that this compensation was not fair market value, and so it *must have been* remuneration for referrals. But that inference does not follow. Pay above the 90th

25

percentile does not, by itself, support an inference of inducement. *See Bookwalter*, 946 F.3d at 172. Again, by definition, ten percent of physicians make more than the 90th percentile. Isolated instances of high compensation do not suffice; something more must raise the inference that the remuneration was to induce referrals. *Cf. id.* (finding that pay "two or three times more than the 90th percentile" and bonuses that "alone exceeded the 90th percentile of total compensation," in addition to other factors, raised a plausible inference that pay was for referrals). And Kyer's complaint falls well short.

Second, she alleges that a marketing stipend for THSPP physicians was remuneration meant to induce THSPP physicians' referrals to the hospitals. In May 2020, Ulery sent a letter to certain physicians explaining that THSPP would give its physicians a $5,000 annual stipend to promote their practices. The letter encouraged the THSPP physicians to spend that stipend on "dinners with referral source[s], food for the office of the referral sources, and holiday or other de minimis gifts." J.A. 127. The stipend was also specifically *not* intended for on-air advertising opportunities or other general marketing. But the complaint has it backwards: THSPP physicians received the stipend to induce them to *attract* patients to their *own* practices, not to refer them elsewhere.[22] So the recipient THSPP physicians were the inducers of referrals from outside referring physicians, and were not themselves being induced to refer to the hospitals. Kyer does not

---

[22] The complaint does not allege that the stipend was indirect remuneration to the outside referring physicians. Nor does it connect the meals or gifts to referrals for items or services payable under a "Federal health care program." *See* 42 U.S.C. § 1320a-7b(b)(2)(A), (f).

allege how these stipends induced the THSPP physicians—the persons receiving the alleged kickbacks—to make referrals to the hospital. So the Anti-Kickback theory falls.

### B. The Complaint Does Not Plead With Particularity A Conspiracy Or Reverse False Claim

The remaining counts also fail to state a claim. A conspiracy claim requires a plaintiff to show that the defendants "agreed that a false record or statement would have a material effect on the Government's decision to pay a false or fraudulent claim." *Nicholson*, 42 F.4th at 193 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008)) (cleaned up). Here, because the underlying conduct didn't make the claims false, the alleged conspirators did not agree to do anything unlawful.

Finally, a concealment-or-avoidance-of-obligation claim, also known as a reverse false claim, requires Kyer to plead that Defendants "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[ed] an obligation to pay . . . the Government." 31 U.S.C. § 3729(a)(1)(G). That "obligation" is an "established duty [to pay], whether or not fixed, arising from . . . the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Kyer claims that Defendants, by obtaining federal funds through fraudulent means, automatically had an obligation to repay the government; by not doing so, they improperly avoided that obligation. We need not decide whether that theory of liability holds.[23]

---

[23] Our Court has not addressed whether the receipt and retention of funds obtained through a false statement automatically lead to reverse false claim liability. The Second Circuit has held that when reverse false claims "mirror" the false claim, the reverse false claim basis is "redundant" and "not actionable under subsection (a)(1)(G)." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119–20 (2d Cir. 2021). There may be daylight between these two offenses, because a direct false claim does not require that the defendant

Because she has not properly alleged any false claims, the reverse false claim necessarily fails as well.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING VACATUR AND LEAVE TO AMEND

A district court cannot grant a post-judgment motion to amend unless the court first vacates the judgment under Rule 59(e) or 60(b). *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc). When a district court considers a Rule 59(e) motion alongside a Rule 15(a) motion to amend, the breadth of its discretion allows it "simply to turn to the standard applicable to the motion to amend." *Daulatzai*, 97 F.4th at 179. That is, the vacatur and amendment decisions merge into one. Rule 60(b), on the other hand, provides only six grounds for relieving a party from judgment. Fed. R. Civ. P. 60(b)(1)–(6), (c)(1).

The district court denied vacatur and leave to amend on the ground that further amendment would prejudice Defendants. Kyer only raised one ground for Rule 60(b) vacatur—"any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). To prevail under that catchall provision, she must show, among other factors, that there is an "absence of prejudice to the opposing party." *Smith v. Bounds*, 813 F.2d 1299, 1303 (4th Cir. 1987). Similarly, leave to amend under Rule 15(a) may be denied where "the amendment would be prejudicial to the opposing party." *Laber*, 438 F.3d at 426 (citation omitted). The district court relied solely on prejudice to Defendants when denying the motions.[24]

---

actually receive funds from the submission of a false claim. But we need not address that question here.

[24] Defendants claim that the district court also found that amendment would be futile based on Kyer's failure to include a new amended complaint. Response Br. at 36. This

We review the district court's denial of vacatur and amendment for abuse of discretion. *Laber*, 438 F.3d at 428 (Rule 59(e)); *Daulatzai*, 97 F.4th at 179 (Rule 60(b)).[25] We find none. While "[d]elay alone is not enough to deny leave to amend," it is "evidence that goes to prove . . . prejudice." *Nicholson*, 42 F.4th at 197. And "prejudice will naturally be much easier to show . . . the more time has passed between a first attempt and a proposed amendment." *Id.* at 198. Kyer filed her original complaint in 2020. In 2024, after Defendants moved to dismiss, she filed an amended complaint as a matter of course in the hopes of "address[ing] some of the concerns raised." Dist. Ct. ECF No. 45 at 1. Throughout that period, she had access to more than 500,000 pages of documents produced by Defendants in response to the government's subpoena. That's years of unilateral pre-amendment discovery that Kyer could have used to fine-tune her fraud claims. *See Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 480 (4th Cir. 2006). Defendants moved to dismiss the amended complaint, giving her the benefit of yet another roadmap for filling in the gaps. When the district court ruled on the motion seven months later, Kyer didn't offer a proposed second amended complaint. Rather, she sought more time to put something

---

reading is based on the district court's note that "Relator must cross the chasm from '*something* [being] alleged to have happened at the hands of *someone*' to particularized claims of fraud.'" J.A. 210 (citation omitted). But this was part of the district court's prejudice analysis, as the court added that "[t]his . . . is the kind of amendment prejudicial to Defendants," because Relator's proposed cure would raise a new legal theory and force Defendants to do a "complete re-evaluation." J.A. 210.

[25] When the district court denies leave to amend on futility grounds, our review is *de novo*. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021). Because the district court grounded its decision on prejudice rather than futility, the abuse-of-discretion standard governs.

together. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that "undue delay" and "repeated failure to cure deficiencies" would justify denial). And Kyer has "not shown, even on appeal, how amendment would cure the deficiencies in [the] complaint." *Willner v. Dimon*, 849 F.3d 93, 114 (4th Cir. 2017). Her examples for how she "could further clarify" the violations, Reply Br. at 24, are too vague to provide any "indication of the amendments [she] wishes to make," let alone bridge the inferential gaps identified above. *Willner*, 849 F.3d at 114. When so much time, access, and guidance have failed to nudge the complaint along, the district court may reasonably put its foot down rather than permit another round because of yet another vague promise of clarity.

*    *    *

After bringing each allegation into focus, any fraud that the complaint conjures appears only in the corner of the eye—a mirage that dissipates when viewed directly. Kyer failed to allege fraud with the kind of particularity that Rule 9(b) requires, so we affirm the district court's dismissal. And the district court acted within its discretion in denying vacatur and post-judgment leave to amend. Accordingly, the judgment is

*AFFIRMED*.

30